UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT L. BURNETTE,

      Plaintiff,

v.

STEVEN JAMES RANDO, ET AL.,

      Defendants.

_____/

Case No. 06-12112

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS RANDO, DAKIN, CARPENTER, GREEN AND STATE OF
MICHIGAN'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT [32] AND
GRANTING DEFENDANTS REED AND JACKSON COUNTY'S MOTION FOR
SUMMARY JUDGMENT AND DISMISSAL [31]**

      This is a civil rights action, brought pursuant to 42 U.S.C. § 1983, alleging claims of

unreasonable search and seizure, excessive force, and deliberate indifference to serious

medical needs in violation of the Fourth and Fourteenth Amendments against all

Defendants.[1]  Plaintiff further claims that Defendants conspired to interfere with his civil

rights in violation of 42 U.S.C. § 1985(3) and § 1986.

      This matter comes before the Court on Defendants' motions to dismiss or for summary

judgment.  For the reasons stated below, this Court GRANTS Defendants Reed and

---

[1]This Court has dismissed Plaintiff's § 1983 claims under the First, Fifth, and Eight Amendments for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  This Court also dismissed without prejudice Plaintiff's state-law claims of gross negligence, negligence, assault and battery, false arrest, false imprisonment, malicious prosecution, and violation of Michigan's Constitution.  (5/31/06 Order.)

Jackson County ("County Defendants")'s motion for summary judgment and dismissal [31], and GRANTS IN PART AND DENIES IN PART Defendants Rando, Dakin, Carpenter, Green and State of Michigan ("State Defendants")'s motion to dismiss or for summary judgment [32]. State Defendants' motion is GRANTED as to Defendants Dakin, Carpenter, Green and the State of Michigan. It is DENIED as to the § 1983 claim against Defendant Rando alleging a violation of Plaintiff's Fourth and Fourteenth Amendment rights to be free from the use of excessive force. That is the only remaining claim left for trial. All other claims are DISMISSED.

## I.    Facts

The lawsuit arises from the September 17, 2004 arrest of Plaintiff on charges of resisting, obstructing, or assaulting Defendant State Troopers Rando, Carpenter and Green.[2] The facts giving rise to Plaintiff's claims are as follows.

### Plaintiff Leaves Work and Parks in Private Driveway

In the early afternoon of Friday, September 17, 2004, Plaintiff left his job at the General Motors power train plant in Ypsilanti after working all day. (Pl.'s Dep. at 15.) He planned to drive to Grass Lake for the weekend. Before getting on the highway, Plaintiff stopped at the liquor store. The store clerk told Plaintiff that he did not look very good. Plaintiff admitted that he was feeling weak, dizzy, and had a headache. Plaintiff had not taken his cholesterol or blood pressure medication that day. He is also a diabetic, but was not taking insulin or other diabetic medication at that time. (Pl.'s Dep. at 55-56, 63-65.)

---

[2]Plaintiff was also charged with operating a motor vehicle on a suspended license and while intoxicated. Both those charges were dropped on the first day of Plaintiff's criminal trial. (Pl.'s Ex. 1, 1/5/06 Trial Tr., Vol. I at 5-6.)

Plaintiff purchased a double shot of gin and a 12-ounce can of Budweiser, and drank it in the parking lot of the liquor store and then drove off. (Pl.'s Dep. at 64.) After he was driving on the interstate for about 35 miles, Plaintiff started to fall asleep at the wheel. He exited I-94 at Mt. Hope Road, continued down Mt. Hope Road, and stopped in the private driveway of a home. (Pl.'s Dep. at 67-70.) Plaintiff did not know the homeowners, Mr. and Mrs. Throne, and was only three to five miles away from his final destination in Grass Lake where he keeps a recreational trailer. (Pl.'s Dep. at 154; R. Throne Dep. at 7.)

Mrs. Throne was the first to notice Plaintiff. While in her garage, she saw Plaintiff's car parked at an angle in her driveway, noticed other traffic on Mt. Hope Road had stopped or slowed down, and noticed that other drivers were looking in her direction. Plaintiff motioned her over to his car and told her that he was just tired from working a 12-hour shift and not drunk. Mrs. Throne noticed that his eyes were very bloodshot and one eye was protruding. The driver's side window was completely down and the sun roof was open. All the other windows on Plaintiff's car were closed. (C. Throne Dep. at 7-12, 50, 55.)

Mrs. Throne did not respond to Plaintiff and went back into the house. She thought he was probably drunk or on drugs and took him a cup of coffee. Plaintiff subsequently threw the coffee and cup out of his window onto her property. (*Id.* at 12-13, 15.)

Mrs. Throne did not tell Plaintiff it was okay for him to be in her drive, but she did not ask him to leave. (*Id.* at 13, 59.) She thought he was on drugs because he would just raise himself out of the sunroof, throw his arms around and yell loudly at times. She could not understand what he was saying. (*Id.* at 15-16.) She did not hear him praising the Lord, and his actions did not appear to her to be religious in nature. (*Id.* at 57.)

Mrs. Throne wanted to call the police right away because Plaintiff's eyes and his behavior did not appear normal. She did not smell alcohol on Plaintiff. (*Id.* at 17-19, 47, 56.) Mrs. Throne drew her husband's attention to Plaintiff's presence. He was in the backyard cutting the grass on his lawn tractor. (R. Throne Dep. at 14.)

Mr. Throne approached Plaintiff, who still sat in his car. Plaintiff told him that he was very tired and needed to sleep a little. Mr. Throne noticed that Plaintiff's left eye was "very bulgy" and looked "like it was about ready to pop out." Mr. Throne told Plaintiff that he could rest in his drive for a while but asked him to rearrange his car in the driveway. Plaintiff unsuccessfully attempted to do so a number of times. Mr. Throne testified that something was obviously wrong with Plaintiff. (R. Throne Dep. at 11-15.) Plaintiff waved Mr. Throne over to him several times when he passed by with the lawn tractor. One moment, Plaintiff would be talking about how God had helped him and the next time Plaintiff would be cussing and swearing with his hands up through the sun roof. Plaintiff was very loud, very erratic, very radical at times in what he was talking about, and often not making sense. Plaintiff was not trying to sleep. (R. Throne at 19-20, 71-72.) At one point, Plaintiff told him that he had so many tickets that he did not want to drive. Plaintiff then threw his keys out of the sun roof, and Mr. Throne picked them up off the grass and put them in his pocket. (R. Throne at 21.) Because of Plaintiff's physical and mental condition, Mr. Throne did not believe he should be driving. Mr. Throne also declined Plaintiff's requests to drive him to the Post Office or an unspecified camp ground because he felt that it would be dangerous to be in the car with Plaintiff. Mr. Throne did not ask Plaintiff to leave his property because he was concerned that he would kill someone if he drove on the highway. (R. Throne Dep. at 40-41, 45, 59.)

After about 30 to 45 minutes of watching this behavior, Mr. Throne agreed with his wife that they should call the police. He called 911, telling the operator that someone was in his driveway acting very strangely and he wanted the police to come and investigate. He did not tell the 911 operator that he initially told Plaintiff he could stay in his driveway. He decided to call the police because of Plaintiff's unpredictable and strange behavior. Mr. Throne believed that Plaintiff was obviously more than just tired; he never saw Plaintiff recline his seat or otherwise attempt to sleep. He wanted the police to remove Plaintiff from his property. (R. Throne at 20-23, 52.) Although Mr. Throne had Plaintiff's keys, he did not know whether Plaintiff had another set and wanted to make sure he did not attempt to drive away and possibly kill someone. (R. Throne at 63-64.)

**Officers Arrive At the Throne Home**

The following facts are from Mr. and Mrs. Throne and the Defendant officers.

Trooper Rando was dispatched to the Throne residence on Mt. Hope Drive in response to "an unwanted subject that was possibly drunk" at that address. Based on that dispatch, Rando believed that Plaintiff was not wanted on the property. (Rando Dep. at 27-28.) It was not until the preliminary examination on Plaintiff's criminal charges, that Rando learned that Mr. Throne had initially consented to allowing Plaintiff to sit in his car on Throne's driveway. (*Id.* at 28-29.)

About four or five minutes after the 911 call, Trooper Rando arrived at the Throne home in uniform and in a marked vehicle. (C. Throne Dep. at 20-21, 23.) He spoke with Plaintiff before speaking with the homeowners. (Rando Dep. at 29.) Rando engaged Plaintiff in conversation, asking him for identification. Only the driver's side window and the sun roof were open on Plaintiff's car. (R. Throne Dep. at 27, 54; Rando Dep. at 31-32.)

5

Plaintiff, who was seated in the passenger seat but leaning across to the driver's seat, acted nervous and excited and was moving back and forth in the front seat. Trooper Rando was concerned that Plaintiff might have a gun because of his behavior and because he was partially hidden behind the dashboard. (Rando Dep. at 30-32, 36.) Mr. Throne testified that Plaintiff lunged toward the glove box. At that point, Trooper Rando backed up and told Throne, who was in the vicinity, to go into the house. (R. Throne Dep. at 28.) Mr. Throne went to his garage but could see Trooper Rando radio for backup and an ambulance. (R. Throne at 28; Rando Dep. at 30; Rando Police Incident Report at 2.) Throne had, by that time, given Plaintiff's car keys to Trooper Rando. (Pl.'s Ex. 1, 1/5/06 Trial Tr., Vol. I at 75.)

Within minutes, State Troopers Green and Carpenter, respectively, responded to Rando's call, arriving within seconds of each other. Jackson County Deputy Reed was the last to arrive, also within seconds. (Rando Dep. at 30; Green Dep. at 18; Carpenter Dep. at 54.) When he responded, Deputy Reed understood that there was a person in the driveway refusing to leave and that another officer on the scene had asked for backup. (Reed Dep. at 29-30.)

When Reed was arriving on the scene, Rando was warning Troopers Green and Carpenter that Plaintiff might have a gun and to be careful. (Rando Dep. at 30.) Deputy Reed did not hear this. (Reed Dep. at 39.) The three Troopers had decided to surround Plaintiff's four-door Cadillac in case Plaintiff exited. Trooper Carpenter was not sure if Deputy Reed was there at that time, and does not recall talking with Reed. (Carpenter Dep. at 56.) Deputy Reed testified that he did not discuss what action to take with the Troopers. (Reed Dep. at 37-38.)

Rando went to the front, driver's side door of Plaintiff's car. He was talking to Plaintiff through the only open window. Carpenter and Green went to the front, passenger's side door, which was locked. (Green Dep. at 19-20; Carpenter at 56.) Without talking with the other officers, Reed took a backup position, towards the rear passenger's side door. (Green Dep. at 21; Reed Dep. at 32-33, 35.) Plaintiff was still in the front passenger seat, but leaning over toward the front driver's seat. (Green Dep. at 24).

After the officers approached the car, Trooper Rando asked Plaintiff if he had any weapons, and Plaintiff made some very loud, excited statements alluding to the fact that he had a weapon. That's when the situation escalated. (Green Dep. at 20-23; Rando Police Incident Report at 3.)

Deputy Reed heard Rando tell Plaintiff that he was under arrest, and a struggle started between the two through the front driver's side window. (Reed Dep. at 45, 50.) Reed observed Plaintiff reach out of the car, grab Trooper Rando's wrist or forearm, which he considered to be a criminal assault on an officer. (Reed Dep. at 45-47, 78; Rando Police Incident Report at 3.) Reed, at that time, attempted to enter the car through the rear, driver's side door. The door was locked and he could not enter. Within seconds, someone unlocked the door and he began to enter the back seat.

Trooper Carpenter had gone around to the driver's side after Trooper Rando unsuccessfully attempted to open the doors. Troopers Rando and Carpenter then both tried to reach in the open window on the driver's side and unlock the doors. (Green Dep. at 20-23; Carpenter Dep. at 59.) The sun roof was also open, and Green decided to jump up with his torso on the passenger's side roof of the car, reach into the sun roof, and unlock the doors. (Green Dep. at 20, 22-24; Carpenter Dep. at 57.) Ultimately, Carpenter was

able to reach in from the driver's side and hit the unlock button. Trooper Green got off the roof, opened the front passenger door and began to pull Plaintiff out of the car by his right wrist. (Carpenter Dep. at 59-62.) Plaintiff was screaming, "My wrist, my wrist." (Rando Dep. at 36-37.) After Carpenter unlocked the doors, he went around the car to the passenger's side, grabbed Plaintiff's left arm, and helped Green pull Plaintiff from the car and to the ground. (Carpenter Dep. at 59-62; Green Dep. at 25.) Carpenter did not physically get into the car. (Carpenter Dep. at 60.)

Trooper Green, with the assistance of Trooper Carpenter, pulled Plaintiff's upper body forward from the car and to the ground. All of this took only seconds. Plaintiff did not fall to the ground; the officers quickly brought him to the ground, face-down and attempted to handcuff both of his hands behind his back. Trooper Green told Plaintiff to put his hands behind his back. Trooper Carpenter also told him to calm down and get his hands behind his back. Plaintiff was struggling, pulling away from them, kicking, yelling for help, and screaming. Trooper Green got control of Plaintiff's legs after he was handcuffed. (Green Dep. at 25-26; Carpenter Dep. at 62-65; Reed Dep. at 59, 62; Rando Dep. at 38.) Trooper Carpenter does not recall seeing where Deputy Reed was at this time. (Carpenter Dep. at 62.)

As Plaintiff was being pulled out the front passenger side door, Reed testified that he exited the car. (Reed Dep. at 50-52.) He was never totally in the car. (Reed Dep. at 59.) He then went around the rear of the car to the front, passenger's side where Plaintiff had been pulled from the car and brought to the ground. (Reed Dep. at 59.) Plaintiff was lying face-down on the ground and was in the process of being handcuffed. (Reed Dep. at 60.)

Before exiting Plaintiff's car, Deputy Reed did not see any blood on Plaintiff. (Reed Dep. at 53.)

Trooper Rando, in the meantime, had gone around the car and was near Troopers Green and Carpenter as they attempted to handcuff Plaintiff's hands behind his back. (Rando Dep. at 36-37.) While they were struggling with Plaintiff, Rando admits that he kicked Plaintiff twice. First, he kicked both Plaintiff's arm and Trooper Carpenter's arm with his shin. He is not sure whether that kick hit Plaintiff's eye. Tooper Rando then kicked Plaintiff a second time. On the second kick, Trooper Rando's foot struck Plaintiff's eye or the side of his face. He first saw blood a couple of seconds after the second kick. He admits the second kick caused the injury to Plaintiff's eye. During this struggle, he heard Plaintiff yelling "practice what you preach" and for help. (Rando Dep. 39-41.)

While still struggling with Plaintiff, Troopers Green and Carpenter both saw Trooper Rando kick at Plaintiff towards the left side of his face, striking him in the head twice. For the first time, both then saw Plaintiff's blood. He was not handcuffed at that time. Troopers Green and Carpenter were still trying to get Plaintiff under control. Plaintiff was still pulling away and kicking at the officers. (Green Dep. at 27-28; Carpenter Dep. at 63-66.) Plaintiff continued to struggle, move around, and kick even after he was handcuffed. (Carpenter Dep. at 67.)

While the two Troopers were trying to handcuff Plaintiff's hands behind his back, Deputy Reed, who had just exited the rear seat of Plaintiff's car and had come around to the area where Plaintiff was on the ground, could see that Plaintiff had a cut in the area of the left eye that was bleeding quite a bit. He did not see Trooper Rando kick Plaintiff. In

9

fact, he did not learn of it until subsequent legal proceedings. (Reed Dep. at 61, 72, 75-76.) Deputy Reed testified that he never touched Plaintiff. (Reed Dep. at 68, 76.)

One of the Troopers called for an ambulance. It was obvious that Plaintiff had suffered a serious injury to his left eye. Plaintiff's left eye was out of its socket and there was lots of blood. (Dr. Moroi Dep. at 38-39.) The ambulance arrived within three to four minutes. (Green Dep. at 29; Carpenter Dep. at 50, 67; Reed Dep. at 64.) None of the officers at the scene administered first aid to Plaintiff before the ambulance arrived. Trooper Green testified that he did not do so because he did not have the level of first aid training to address that severe an injury and did not want to cause any more harm to Plaintiff. (Green Dep. at 29.) The doctor who treated Plaintiff at the University of Michigan Hospital testified that the only appropriate first aid treatment would be to put a clean, protective cover over the eye to keep out foreign objects. She further testified that no foreign objects were found in Plaintiff's eye. (Dr. Moroi Dep. at 15, 23-24.)

The ambulance took Plaintiff to Foote Hospital. Troopers Green and Rando also went to the hospital. Trooper Carpenter and Deputy Reed did not. (Green Dep. at 29; Carpenter Dep. at 67-68.) Due to the extent of his eye injuries, Plaintiff was subsequently transferred to the University of Michigan Hospital. Dr. Moroi performed surgery on his eye that day.

While at Foote Hospital with Plaintiff, Trooper Rando called Sergeant Dakin. He told Sergeant Dakin that Plaintiff was resisting arrest, was seriously injured, had been taken to Foote Hospital, and was being transferred from that local hospital to the University of Michigan Hospital. (Rando Dep. at 17-19; Dakin Dep. at 11-12.)

**Plaintiff's Eye Injury**

Plaintiff had previously suffered an injury to his left eye when he was hit with a baseball in the early 1970's.  He suffered from glaucoma as a result.  (Pl.'s Dep. at 146-47.)  After the trauma to his left eye on September 17, 2004, Plaintiff had surgery to repair a ruptured globe and received follow-up treatment.  (Dr. Moroi Dep. at 7-12, 17.)  Ultimately, Plaintiff's left eye had to be removed.

**Plaintiff's Version of Facts**

Plaintiff testified to the following.  Contrary to Mr. Throne's testimony, he did sleep in the Throne's driveway both before and after Trooper Rando arrived at their home.  (Pl.'s Dep. at 74-76.)  Next thing he knew, about six to eight officers were on both sides of his car and coming through the roof.  They did not ask him if he had a weapon.  (Pl.'s Dep. at 80-81.)  He covered his head because someone was hitting him on the top of his head with an object other than a hand through the sun roof.  Plaintiff admits, however, that he had no cuts or bruises on the top of his head.  (Pl.'s Dep. at 80-83.)

Moreover, when he was dragged from the car, he was hit all over and felt feet on his back.  After he was pulled out of his car, his arms and legs were handcuffed and six to eight officers stood over him and beat him on his arms, back and head.  He did not see anything, did not know where any officer was standing, and could not say specifically who or how many officers beat him.  He landed on the ground on his stomach and could see blood from his eye on the ground.  (Pl.'s Dep. at 78, 84-95, 96-105.)  He never resisted in any way.  (Pl.'s Dep. at 100-01.)

**Plaintiff's Criminal Charges and This Lawsuit**

The Jackson County Prosecutor subsequently brought criminal charges against Plaintiff for (1) resisting, obstructing or assaulting a police officer; (2) operating a vehicle with a suspended or revoked license; and (3) operating a vehicle while intoxicated. (Pl.'s Ex. 5, Criminal Information.) A preliminary examination was held, the judge determined that there was probable cause for the charges, including the resisting, obstructing or assaulting a police officer charges, and thus Plaintiff was bound over for trial. (Preliminary Exam. Tr. at 127-130.) Plaintiff was subsequently acquitted of the charges at trial.[3] (Pl.'s Dep. at 133.)

Plaintiff then filed this lawsuit on June 8, 2006.

## II. Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

---

[3]At trial, the prosecutor dropped the last two charges because (1) the status of his license on September 17, 2007 was not clear; and (2) recalculation of his blood alcohol level showed it to be .07 which is below the .08 limit. (Pl.'s Ex. 1, 1/05/06 Trial Tr., Vol. 1 at 5-6.)

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

This Court first addresses State Defendants' argument that the Eleventh Amendment bars Plaintiff's §§ 1983, 1985, and 1986 claims against the State of Michigan and the State Defendants in their official capacities.[4]

### A. Eleventh Amendment Immunity

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *U.S. Const. Amend. XI.* The amendment's applicability has been extended to suits brought by citizens against their own states. *Bd. of Trs. of the Univ. of Ala. v.*

---

[4]Plaintiff failed to address the State Defendants' immunity arguments.

*Garrett*, 531 U.S. 356, 363 (2001); *S. J. v. Hamilton County*, 374 F.3d 416, 419 (6th Cir. 2004). "Sovereign immunity applies not only to the states themselves, but also to . . . . those government entities that act as 'arm[s] of the State.'" *Id.* (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 380 (1977)). It also applies to individuals sued in their official capacities because they "stand in the shoes of the entity they represent." *Id.* at 520 (internal quote and citation omitted). Eleventh Amendment immunity, however, does not extend to political subdivisions like counties or municipalities. *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (*on reh'g en banc*), *cert. denied*, 547 U.S. 1021 (2006).

Because there has been no express waiver or constitutional abrogation of the State's immunity under the Eleventh Amendment, the §§ 1983, 1985, and 1986 claims asserted by Plaintiff against the State of Michigan and Defendants Rando, Dakin, Carpenter, and Green in their official capacity are DISMISSED.[5]

The Court next addresses the claims against the State Defendants in their individual capacities and the claims against the County Defendants, beginning with Plaintiff's § 1983 claim that he was unreasonably seized in violation of his Fourth and Fourteenth Amendment rights.

### B. Section 1983 Claims

To prove his claims under 42 U.S.C. § 1983, Plaintiff must establish: (1) that his constitutional rights were deprived; and (2) that a person acting under color of state law

---

[5]Dismissal is also proper because neither the State nor its agencies are "persons" subject to liability within the meaning of these statutes. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989).

subjected him to the deprivation or caused him to be subjected to the alleged deprivation. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).

### 1. Unreasonable Seizure or Arrest

Plaintiff claims that his Fourth and Fourteenth Amendment rights were violated because he was arrested without a warrant and without probable cause. A seizure is reasonable if an officer has probable cause to arrest. "Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge 'were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense.'" *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Whether probable cause exists is determined by evaluating the totality of the circumstances, and the analysis "includes a realistic assessment of the situation from a law enforcement officer's perspective." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (*en banc*).

At Plaintiff's preliminary examination on criminal charges, the state court found that probable cause existed to arrest Plaintiff on September 17, 2004, for resisting, obstructing, or assaulting a police officer. (Prelim. Exam. Tr. at 127-130.) Accordingly, Defendants argue, Plaintiff is collaterally estopped from litigating the issue again in this civil action. *See Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1998) (observing that a finding of probable cause in a state-court criminal matter cannot be relitigated in a subsequent § 1983 action when the accused has contested probable cause at that preliminary hearing.) This Court agrees with Defendants.

Despite Plaintiff's claims to the contrary, he did contest probable cause at the preliminary examination hearing held in state court on the criminal charges brought against

him as a result of his conduct on September 17, 2004. During that examination, Plaintiff was represented by his present counsel. (Prelim. Ex. Tr. at 3.) Over the course of the examination, the state court heard the testimony of Richard Throne and Troopers Rando, Green and Carpenter. (*Id.* at 2-122.) Plaintiff's counsel cross-examined each witness. (*Id.*) At the conclusion of this preliminary examination hearing, the state-court judge concluded that, based on the totality of the circumstances and the testimony provided, there was probable cause to believe that Plaintiff had resisted, obstructed, or assaulted the Troopers on September 17, 2004. (*Id.* at 127-130.) The judge then bound Plaintiff over for trial on those charges. (*Id.* at 130.)

As the record reveals, Plaintiff had a full and fair opportunity to litigate whether probable cause existed to maintain a charge of resisting, obstructing or assaulting a police officer. He is thus barred from relitigating that issue in this § 1983 action. *Smith*, 136 F.3d at 1077.

Even if this Court were to consider Plaintiff's arguments, it would arrive at the same conclusion as that of the state-court judge in the preliminary examination hearing. Evaluating the totality of the circumstances, with a realistic assessment of the fast-evolving situation from a law enforcement officer's perspective, this Court concludes that probable cause existed for the warrantless arrest of Plaintiff for resisting, obstructing, or assaulting Troopers Rando, Green and Carpenter on September 17, 2004.

Mr. Throne did not inform the 911 operator or Trooper Rando that he had initially told Plaintiff he could stay on his driveway. Trooper Rando responded to the 911 call with the understanding that there was an unwanted subject who was possibly drunk in Mr. Throne's private driveway. There is ample evidence that Trooper Rando and Mr. Throne had

observed Plaintiff's bizarre, unpredictable, and erratic behavior. Based on that behavior, Trooper Rando believed that Plaintiff might have a weapon, and he conveyed that information to Troopers Green and Carpenter. Plaintiff's excited and bizarre behavior continued, and he did not exit his vehicle despite repeated requests to do so. Deputy Reed testified that he saw Plaintiff reach out of the car window and grab Trooper Rando's wrist or forearm. Troopers Rando and Green, believing they heard Plaintiff say he had a weapon, reasonably believed that circumstances existed to remove Plaintiff from his vehicle and arrest him. Plaintiff admits he was kicking and screaming as he was removed from the car and handcuffed.

This Court rejects Plaintiff's argument that a warrant was required here. As discussed above, there was probable cause to enter Plaintiff's car to seize him. As the Supreme Court observed in *Maryland v. Dyson*, 527 U.S. 465, 466 (1999), the warrantless search of an automobile satisfies the Fourth Amendment where there is probable cause; there is no separate exigency requirement. Accordingly, Plaintiff's § 1983 claims against all Defendants based on an alleged violation of his Fourth and Fourteenth Amendment rights because of an unreasonable seizure are DISMISSED.

The Court now considers Plaintiff's excessive force claims.

**2.  Excessive Force**

The right to be free from the use of excessive or unreasonable force is a clearly established constitutional right. *See Graham v. Connor*, 490 U.S. 386, 392-99 (1989). "The 'reasonableness' inquiry in an excessive force case is an objective one; consequently, [the Court] must consider 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent

17

or motivation.'"  *Ingram v. City of Columbus*, 185 F.3d 579, 596 (6th Cir. 1999) (quoting *Graham*, 490 U.S. at 397).

The objective reasonableness of the officers' actions is judged "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Ingram*, 185 F.3d at 596 (quoting *Graham*, 490 U.S. at 396).  The reasonableness determination is fact-specific and is analyzed under a totality of the circumstances test which considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Ingram*, 185 F.3d at 596 (internal quotes and citation omitted).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (internal quotes and citation omitted).  As observed by the Sixth Circuit:

> Under *Graham*, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene.  We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.  What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland*, 954 F.2d 343, 346 (1992).

To establish his claim of excessive force, Plaintiff must prove that Defendants (1) actively participated in the use of excessive force, (2) supervised an officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

### a.  Troopers Green and Carpenter

As to the first category, this Court concludes that Troopers Green and Carpenter did not actively participate in the use of excessive force. Considering the fast evolving and uncertain facts and circumstances confronting Troopers Green and Carpenter in rapid succession, this Court concludes that their actions were objectively reasonable. Green and Carpenter were warned by Trooper Rando that Plaintiff might have a gun. The situation quickly escalated when they approached Plaintiff's car. In response to Trooper Rando's question whether he had any weapons, Trooper Green heard Plaintiff making some very loud, excited statements alluding to the fact that he did. Trooper Rando told Plaintiff that he was under arrest. There was a scramble to get Plaintiff's car door open. Plaintiff was not cooperating, was eventually pulled out of the car and to the ground, and was handcuffed. Although Plaintiff complains of bumps, scraps, or bruises as a result of this conduct, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotes and citation omitted).

The second category is not relevant as to Troopers Green and Carpenter as neither was a supervisor of the other Defendants.

The third category for liability requires additional proof. To find Troopers Green and Carpenter liable for failing to protect Plaintiff from the use of excessive force, Plaintiff must show that "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner*, 119 F.3d at 429 (emphasis added). Plaintiff cannot satisfy either prong of this test.

The remaining and principal claim of excessive force here is that Trooper Rando kicked Plaintiff two times in the face. Plaintiff presents no evidence that, before Trooper Rando kicked Plaintiff in the face, either Trooper Green or Carpenter had observed anything or had any reason to know that he would do so. To the contrary, their testimony reveals that such conduct was not anticipated or expected. Plaintiff was not bleeding before the kicks. Plaintiff, as well as Troopers Rando, Green, and Carpenter, all testified that the two kicks were in rapid succession and without prior warning. Accordingly, a reasonable jury could not find that Trooper Green or Carpenter knew or should have known that Trooper Rando would kick Plaintiff twice in the face or that they had the opportunity to prevent that unknown harm from occurring. Thus, Plaintiff's § 1983 claims against Troopers Green and Carpenter for excessive force are hereby DISMISSED.

### b. Deputy Reed

Plaintiff's excessive force claims against Deputy Reed likewise fail. As to the first category, there is no evidence that Deputy Reed actively participated in the use of excessive force. There is no evidence that he was involved in removing Plaintiff from his car, taking him to the ground, or handcuffing him. Deputy Reed was on the other side of the car when Plaintiff was being taken out of the car and brought to the ground. The only evidence that Deputy Reed even touched Plaintiff comes from Trooper Rando's testimony at Plaintiff's preliminary examination hearing. In response to the question from the prosecutor whether Deputy Reed had any physical contact with Plaintiff, Trooper Rando replied that Deputy Reed "may have at one time been holding his legs, his lower part of his legs." (Prelim. Exam. Tr. at 66 (emphasis added).) On cross-examination by Plaintiff's

counsel, Trooper Rando was asked about the circumstances immediately before he kicked Plaintiff and whether Deputy Reed was holding Plaintiff's feet.

Q. You stopped? What do you mean by you stopped?

A. Once I got to them I stopped and I was, I was evaluating what was going on.

Q. All right. Evaluating what was going on. You had Deputy Reid [sic] holding his, holding the man's feet. Is that correct?

A. I don't know what point in time he was back there. At one time ---

Q. You don't recall?

A. At one time he was back by Mr. Burnette's lower legs but I don't recall what point in time that was.

Q. Let me ask it this way.

Q. At the point at which you came around the vehicle and you saw Mr. Burnette face down on the ground, you say you stopped. Is that correct?

A. Yes.

Q. And you looked at the situation. Is that correct?

A. That's correct.

Q. And you noticed that there were three officers dealing with this man. Is that correct?

A. I think at that point in time I think it was just Trooper Carpenter and Trooper Green.

(*Id.* at 80.)

Viewing this testimony in the light most favorable to Plaintiff, there is no evidence that Deputy Reed actively participated in the use of excessive force. First, as discussed above, Troopers Green and Carpenter were not using excessive force. Second, a reasonable jury could not find that holding Plaintiff's feet while he was being handcuffed to be excessive

force.  Finally, there is no evidence that Deputy Reed held Plaintiff's feet knowing or having reason to know that Trooper Rando would kick him in the face.

The second category for excessive force liability cannot be established because Deputy Reed was not a supervisor of the other Defendants.

The third category for liability likewise cannot be established.  Similar to Troopers Green and Carpenter, Plaintiff presents no evidence here that, before Trooper Rando kicked Plaintiff in the face, Deputy Reed had observed anything or had any reason to know that he would do so.  Moreover, in light of the testimony that the two kicks were in rapid succession and without prior warning, a reasonable jury could not find that Deputy Reed knew or should have known that Trooper Rando would kick Plaintiff twice in the face or that he had the opportunity to prevent that unknown harm from occurring.  Accordingly, Plaintiff's § 1983 claims against Deputy Reed for excessive force are also DISMISSED.

### c.  Trooper Rando

Unlike Troopers Green and Carpenter and Deputy Reed, there are genuine disputed issues of material fact whether Trooper Rando used excessive force on Plaintiff.  Trooper Rando argues that his two kicks in quick succession were a reasonable attempt to control Plaintiff's movements in light of Plaintiff's erratic and unpredictable behavior, his concern that Plaintiff might have a weapon, and that Plaintiff was struggling with Troopers Green and Carpenter.  Plaintiff, on the other hand, argues that his behavior was not unusual, that he never actively resisted the officers, that he posed no immediate threat to the safety of the officers, and that the kicks that severely injured his eye were excessive under the circumstances.  Accordingly, Plaintiff's § 1983 claims for excessive force against Trooper Rando survive Defendants' motion for summary judgment.

### 3. Deliberate Indifference to Serious Medical Needs

Finally, Plaintiff alleges that his Fourth and Fourteenth Amendment rights were violated because Troopers Rando, Green and Carpenter and Deputy Reed were deliberately indifferent to his serious medical need. Specifically, Plaintiff argues that they should have used their first aid training and done something to treat his eye injury in the short time before the ambulance arrived.

To succeed on his § 1983 claims, Plaintiff must establish that these Defendants acted with "deliberate indifference" to his serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Showing negligence in treating him is not enough. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). *Accord, Farmer*, 511 U.S. at 835-36.

A claim of deliberate indifference to serious medical needs has both an objective and subjective component. *Farmer*, 511 U.S. at 834. The objective component requires the existence of a sufficiently serious medical need. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 834). To satisfy the subjective component, Plaintiff must establish that Defendants (1) "subjectively perceived facts from which to infer substantial risk to the prisoner," (2) "did in fact draw the inference," and (3) "then disregarded that risk." *Id.* "Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that 'an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Id.* (quoting *Farmer*, 511 U.S. at 838 and adding emphasis).

The objective component of Plaintiff's claim is not at issue here. It is not disputed that Defendants were aware that Plaintiff had suffered a serious eye injury. Rather, Defendants

23

argue that Plaintiff cannot show that a genuine issue of material fact exists as to the subjective component of Plaintiff's claims that each of the Defendants was deliberately indifferent to Plaintiff's serious medical needs. This Court agrees.

The ambulance arrived within three to four minutes of Defendants' discovery of Plaintiff's eye injury. (Green Dep. at 29; Carpenter Dep. at 50, 67; Reed Dep. at 64.) Defendants did not administer first aid in those three to four minutes. Trooper Reed testified that he did not administer first aid before the ambulance arrived because he did not have the level of training required for such a severe injury and simply did not want to cause Plaintiff more harm. (Green Dep. at 29.)

The doctor who treated Plaintiff at the University of Michigan Hospital testified that the only appropriate first aid treatment under the circumstances would be to put a clean, protective cover over the eye to keep out foreign objects. When she performed surgery on Plaintiff's eye later that day, no foreign objects were found in Plaintiff's eye despite the lack of a protective cover. (Dr. Moroi Dep. at 15, 23-24.) The doctor further testified that it would not have been appropriate for an officer on the scene to place gauze or other type of bandage from a first aid kit over Plaintiff's eye as this would create the risk of compressing the eye and causing further damage. (Dr. Moroi Dep. at 43.)

There is no evidence that these Defendants (1) subjectively perceived facts from which to infer a substantial risk to Plaintiff if they did not administer first aid until the ambulance arrived; (2) that they did in fact draw that inference; and (3) then disregarded that risk. There is no evidence of an intentional denial or delay of medical treatment by any Defendant. At most, there was merely negligence in not placing a clean protective cover

like a paper cup over the eye for the few minutes before the ambulance arrived. Accordingly, Plaintiff's deliberate indifference claims are DISMISSED.

### 4. Municipal Liability - Jackson County

Jackson County is the only municipality named in Plaintiff's suit. Deputy Reed is the only officer employed by Jackson County. Defendant Jackson County can only be held liable under § 1983 if Plaintiff can show that one of Jackson County's police officers violated Plaintiff's constitutional rights. Because Plaintiff has not satisfied this requirement, his claims against Defendant Jackson County and Deputy Reed in his official capacity must be dismissed. *See Cartwright v. City of Marine City*, 336 F.3d 487, 495 (6th Cir. 2003); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001); *Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir. 2000).

### C. 42 U.S.C. § 1985(3) Conspiracy

Defendants argue that Plaintiff cannot establish a conspiracy claim under 42 U.S.C. § 1985(3). This Court agrees.

To prove such a § 1985(3) claim, Plaintiff must establish:

> (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.

*Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998) (quoting *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994). Plaintiff must also "demonstrate that the conspiracy was motivated by a class based animus, such as race." *Id.* Absent a violation of 42 U.S.C. § 1985, a plaintiff may not maintain an action under 42 U.S.C. § 1986. *Browder v. Tipton*, 630 F.2d 1149, 1155 (6th Cir. 1980).

Plaintiff's conspiracy claims arise from facts surrounding the decision to arrest him, how Defendants' police reports were prepared, the Jackson County Prosecutor's decision to prosecute, and the Prosecutor's decision on the first day of trial not to pursue charges for driving on a suspended license or driving while intoxicated. The facts surrounding the decision to arrest are addressed above. The remaining facts are set forth below.

**Preparation of Police Reports**

Trooper Rando testified that he prepared his police report about the September 17, 2004 incident without first discussing it's content with anyone else. As allowed under his union's collective bargaining agreement, he had the union president review his report before submitting it. He did so because he knew that, with Plaintiff's injury, litigation was possible. He informed his supervisor, Lieutenant Yesh, that he was sending it to the union president for review. The union president reworded a few things in the last paragraph, sent it back to Rando the next day, and Rando submitted it. (Rando Dep. at 20-25; Dakin Dep. at 7-8.)

Trooper Green was asked and prepared a supplemental report on September 22, 2004. He did not recall who asked him to write the report or why. He did not recall whether he reviewed Trooper Rando's report before he prepared his supplemental report, or whether he had any conversations with anyone about his report. After it was completed, he placed it in the appropriate bin for review. (Green Dep. at 12-13.)

Trooper Carpenter was also asked by his Sergeant to write a supplement report about the incident. He did so on September 26, 2004. Since Trooper Rando wrote the original report, all other reports on the same case were deemed supplemental. It is not standard practice to write supplemental reports. He denies that he was asked to review Trooper

Rando's report before writing his supplemental report, and was not given any instructions about writing the report. At Plaintiff's preliminary examination hearing, Trooper Carpenter testified that he pulled up and reviewed Trooper Rando's typed report off the State Police computer system before he typed his own report. He did so to help him recall some information about the incident. He could not remember if he also read Trooper Green's supplemental report. He testified that it was standard practice to do this. As required under standard operating procedures, Trooper Carpenter's report would have been reviewed by the Shift Supervisor. His report shows that it was reviewed by Sgt. McGaffigan. (Carpenter Dep. at 40-48; Prelim. Exam. Tr. at 119-122.)

Jackson County Sheriff's Deputy Reed testified that he did not prepare a report because he had no contact with Plaintiff although he was on the scene. (Reed Dep. at 13-14.)

Sergeant Dakin was a shift supervisor with the Michigan State Police at the time of the incident. He confirmed that when a Trooper is involved in an incident with a citizen where injury results, the Trooper must first have verbal contact with the shift supervisor and then submit a written incident report which is reviewed by the Post Commander. He further testified that, under the terms of their union contract, the Troopers are permitted to have contact with their union before submitting a written report. He further testified that there is nothing to preclude one Trooper from reviewing the written report of another before preparing his or her own supplemental report. He does not recall, however, instructing Troopers Green and Carpenter to review Trooper Rando's incident report before writing their own supplemental reports. He further testified that it is not his practice to do so. Trooper Rando's incident report was reviewed by the post commander, and she told him

that all was in order.  Sergeant Dakin never reviewed Trooper Rando's report.  (Dakin Dep. at 6-9, 13-14, 16.)

### Decision to Prosecute Plaintiff on Some and to Drop Other Charges

Trooper Rando submitted a warrant request to the Jackson County Prosecutor's Office for various charges, including assault on a police officer, resisting arrest, littering, and driving on a suspended license.  (Rando Dep. at 25.)  Trooper Green, Trooper Carpenter, Sergeant Dakin, and Deputy Reed did not have anything to do with issuing a warrant against Plaintiff or the prosecutor's decision to initiate criminal proceedings against Plaintiff.  (Green Dep. at 14; Carpenter Dep. at 69-70; Reed at 13-14; Dakin at 15.)

The Jackson County Prosecutor's Office decided to initiate criminal proceedings against Plaintiff on the following charges:  (1) resisting, obstructing or assaulting a police officer; (2) operating a vehicle with a suspended or revoked license;  and (3) operating a vehicle while intoxicated.  (Pl.'s Ex. 5, Criminal Information.)  On May 23, 2005, a preliminary examination was held, and the judge bound Plaintiff over for trial.  (Preliminary Exam. Tr. at 127-130.)  On January 5, 2006, the first day of trial, the prosecutor dropped two charges because (1) the status of Plaintiff's license on September 17, 2007 was not clear; and (2) recalculation of his blood alcohol level showed it to be .07 which is below the .08 limit.  (Pl.'s Ex. 1, 1/05/06 Trial Tr., Vol. 1 at 5-6.)

Plaintiff baldly argues that (1) a conspiracy existed among various Defendants at various times to deprive him equal protection of the law because (2) he is the member of two protected classes:  (a)  that of private property (car) owners who have a right to equal protection of laws that prohibit unlawful searches and seizures; and (b) that of pre-trial detainees who have a right to equal protection of laws that prohibit the use of excessive

force and deliberate indifference to serious medical needs; (3) various acts were committed in furtherance of the conspiracy to deprive him of equal protection because of his membership in a protected class; and (4) he was deprived his Fourth and Fourteenth Amendment rights to be free from an unlawful arrest and use of excessive force.

Plaintiff's conspiracy claims fail for a number of reasons. First, he provides no legal support for his assertion that car owners or pre-trial detainees are members of a protected class recognized under equal protection jurisprudence. Second, he provides no evidence that suggests any of the Defendants discriminated against him because of his membership in these identified classes or acted in concert to discriminate against him because of his membership in these classes. There is no evidence that anyone but Trooper Rando decided to issue a warrant request. There is no evidence that the Jackson County Prosecutor failed to make an independent decision to bring criminal charges against Plaintiff. Accordingly, Plaintiff's § 1985(3) conspiracy claims are DISMISSED.

### D. Supervisory Liability - Sergeant Dakin

Finally, Plaintiff claims that Defendant Dakin failed to supervise Troopers Rando, Green and Carpenter. To establish a claim for improper supervision, "the plaintiff must show 'that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998). Without providing support, Plaintiff argues that Sergeant Dakin directed that charges be manufactured against Plaintiff. The record, in fact, refutes this claim. Sergeant Dakin testified at his deposition that he had nothing to do with Trooper Rando's decision to pursue a warrant request against Plaintiff. (Dakin Dep. at 13-14, 16.) Plaintiff presents no evidence that Sergeant Dakin, when in a supervisory role over Defendants, either

encouraged misconduct or in any way directly participated in it. Accordingly, Plaintiff's claims of supervisory negligence against Sergeant Dakin are DISMISSED.

## V.    Conclusion

For the reasons set forth above, Defendants Reed and Jackson County's motion for summary judgment and dismissal is GRANTED; and Defendants Rando, Dakin, Carpenter, Green and the State of Michigan's motion to dismiss or for summary judgment is GRANTED IN PART AND DENIED IN PART. It is GRANTED as to Defendants Dakin, Carpenter, Green and the State of Michigan. It is DENIED as to the § 1983 claim against Defendant Rando alleging a violation of Plaintiff's Fourth and Fourteenth Amendment rights to be free from the use of excessive force. That is the only remaining claim left for trial. All other claims are DISMISSED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  July 31, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 31, 2007, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager